TEXAS EMPLOYERS' INSURANCE ASSOCIATION V. JACOB PORTLEY

No. A-4285. Decided December 16, 1953.
Rehearing overruled January 20, 1954.
(263 S.W. 2d Series 247)

*Burford, Ryburn, Hincks & Ford* and *Howard Jensen,* all of Dallas for petitioner.

The Court of Civil Appeals erred in holding that there was evidence to support the jury's findings that Jacob Portley thought his condition was not serious and that he, therefore, had good cause for not filing his claim for compensation within six months of his alleged injury. Sandage v. Traders & Gen. Ins. Co., 140 S.W. 2d 871, writ refused; Copinjon v. Aetna Casualty & Surety Co., 242 S.W. 2d 219, writ refused; American Emp. Ins. Co. v. Climer, 220 S.W. 2d 697.

*White & Yarborough* and *W. E. Johnson,* all of Dallas, for respondent.

In rebuttal to petitioner's proposition. Harkey v. Texas Emp. Ins. Assn. 208 S.W. 2d 919; Petroleum Cas. Co. v. Garrison,

174 S.W. 2d 74; Trinity Universal Ins. Co. v. Rose, 217 S.W. 2d 425.

MR. JUSTICE CALVERT delivered the opinion of the Court.

This is a workmen's compensation case in which Jacob Portley, as plaintiff, recovered a judgment for benefits for total and permanent disability. That judgment was affirmed by the Court of Civil Appeals. 258 S.W. 2d 380.

The injury out of which the claim grew was alleged to have occurred on or about March 1, 1950, but claim for compensation was not filed until March 29, 1951. As good cause for his failure to file his claim within the six months period provided in the statute (Article 8307, sec. 4a, R.C.S.) and thereafter until he was severed from his employment on February 19, 1951, plaintiff alleged that he did not realize the seriousness of his condition, thought that he was going to be all right, and was not incapacitated for work.

In answer to special issues the jury found, in substance: (1) that in the beginning of his incapacity the plaintiff believed that his injury was not serious and his condition would improve; (2) that he continued in that belief up until February 19, 1951; (3) that his belief that his injury was not serious was the cause of his failure to file his claim up until February 19, 1951; and (4) that such belief was good cause for the failure to file in time.

By motion for an instructed verdict in the trial court, by point of error in the Court of Civil Appeals and by point of error in this Court the defendant has contended at all times and still contends that the evidence fails, as a matter of law, to show that good cause existed for failure to file the claim prior to February 19, 1951. We agree with the defendant on this phase of the case, rendering unnecessary any discussion of other points of error.

■ Actually, it is to be doubted that the jury's answers to the special issues establish good cause for the plaintiff's failure to file his claim during the period from the date of his injury to February 19, 1951, but the parties have treated them as though they were sufficient in this respect and for the purposes of this opinion we shall regard them in the same light.

The record reflects that the defendant strenuously contested the claim of the plaintiff that he had suffered a compensable

accidental injury, but the evidence viewed from the plaintiff's standpoint reflects that he cut the bottom of his heel by stepping in an open floor drain in the kitchen where he worked; that he continued to work about three days before consulting a doctor, at which time he consulted Dr. Mays, a Chiropodist, who treated him and referred him to Dr. N. T. Watts, a general practitioner. Dr. Mays was not called as a witness. Dr. Watts, who treated the plaintiff for a period of some three weeks, was called as a witness by the plaintiff. He testified that in his opinion the injury suffered by the plaintiff was probably the producing cause or exciting cause of a cancerous condition that developed and subsequently led to the amputation of plaintiff's leg. On August 8, 1950, the plaintiff became the patient of Dr. E. M. Combs, a Chriopractor, who treated him at regular intervals of two or three days through the months of August, September and October and until November 7th, 1950, and again from January 5th through February 1, 1951, about which time he referred the plaintiff to Dr. W. W. Baldwin, an Osteopath. A short while after the plaintiff was severed from his employment on February 19th Dr. Baldwin performed an operation on the plaintiff's right thigh, removing a tumor therefrom. On May 11, 1951, the plaintiff entered Parkland Hospital where on May 21st an operation was performed for removal of his right leg, the condition requiring the operation being diagnosed as malignant melanoma. Dr. Combs was called as a witness for the defendant but neither Dr. Baldwin nor any of the doctors attending the plaintiff as Parkland Hospital were called by either party.

The plaintiff rested his case on his own testimony, and that of his wife and of Dr. Watts. If evidence of good cause for failure to file the claim for compensation before February 19, 1951, is to be found in the record, it must be found in the testimony of these three witnesses.

The plaintiff and his wife, Lois Portley, were examined closely on the nature of the injury and its continuing condition, and it would extend this opinion to unnecessary lengths to quote their testimony here, even in substantial part. We deem it sufficient to point out that their testimony establishes at least these facts: On the day of the injury swelling developed in the right foot and leg that by night made removal of the shoe difficult. However, the plaintiff continued to work until the morning of the third day thereafter when, upon going home, his shoe was removed by his wife who found the place of the injury infected and running, the foot bloody, and the leg swollen to a point just

below the knee. It was then that the paintiff consulted Dr. Mays who referred him to Dr. Watts. Dr. Watts required the plaintiff to remain in bed for the two weeks of March 6th and March 13th and gave him a series of penicillin injections.

At the end of the two-week period the injury and condition seemed to be improving and the plaintiff returned to his work, contrary to the advice of Dr. Watts. About a week after he returned to work his condition began to worsen. About this time a swelling developed that extended into his thigh, and the wound became ulcerated and so sore that he had to cut out a part of his shoe to relieve the pressure. About this time also it became necessary for him to rest his knee and leg on a wooden box while performing some of his duties in order to keep his weight off of his foot; and when he walked he had to walk on his toes because he could not put his weight on his foot, and even then the pressure on the toes caused profuse bleeding of the wound. He began using a taxicab for trips between his home and his place of work because he could not walk the short distances necessary to take the city bus. His foot never got any better. It looked like it would "get worser all the time"; the pain got "greater all of the time" and he "limped more and more as time went on" to the very time he quit his employment. During the time the plaintiff was under the care of Dr. Combs, Lois saw his foot every day and she described its appearance, in testifying, as follows: "It was swollen up and it was black sometimes and turned green, and it would just run all the time. It continually run. And it was just horrible. I can't hardly describe it. That is the best I can do. Q. It was horrible to look at, was it? A. Yes, sir."

The plaintiff's testimony as to when the knot or tumor, removed by Dr. Baldwin, appeared in his thigh in the region of the groin was conflicting. In his deposition, read on the trial, he testified he noticed the development of the tumor about two weeks before his employer sent him home on February 19, 1951. As a witness at the trial, he testified that the knot started coming in his thigh about a week after he went back to work following his treatment by Dr. Watts, and that "it was getting larger and larger all the time" and the pain and suffering were getting "worse and worse during all that time."

The plaintiff testified that at the time he went back to work following his treatment by Dr. Watts, he thought his foot was going to get all right and that was the reason he didn't file his claim in six months. He did not testify that he continued in that belief after his condition began to worsen.

The serious nature of the plaintiff's condition was confirmed by both Dr. Watts and Dr. Combs. Dr. Watts testified that when the paintiff came to him he noticed "a very angry ulcerated heel" that had become infected, with swelling in the foot and ankle and considerable pain; that the condition improved with treatment, but that he reminded the plaintiff of the serious nature of the condition, told him that "it might have far-reaching effects upon him" and advised him that he should not go back to work. Dr. Combs testified that when the plaintiff came to see him on August 8th he had a necrotic condition—"it was rotten and had swelled and had proud fiesh, and was an awful looking mess"; that it was horrible looking.

■ On this record the plaintiff seeks to bring himself under the rule announced in such cases as Texas Employer's Insurance Association v. Clark, Texas Civ. App., 23 S.W. 2d 405, writ dism.; Texas Employer's Ins. Assn. v. Roberts, 135 Texas 123, 139 S.W. 2d 80, and Harkey v. Texas Employer's Ins. Assn., 146 Texas 504, 208 S.W. 2d 919, where it is said that a good faith belief that injuries are not serious, but are trivial, will constitute good cause for delaying the filing of claim for compensation and the fact that almost constant pain exists does not affect the issue. But those cases make clear that delay may not be excused unless the belief that the injury or condition was not serious would have been entertained by a reasonably prudent person in the same or similar circumstances. While ordinarily the question is one for the trier of the facts to determine, a mere statement by an injured person that he did not regard his injuries as serious will not raise a fact issue when the facts themselves put the matter beyond the pale of reason or beyond belief by a prudent person.

The very recitation of the testimony outlined above demonstrates beyond question that from about a week after he went back to work—about March 27, 1950—until he ceased work on February 19, 1951, the plaintiff had a manifestly serious and disabling condition which he was fully aware. At the very least, it was a condition which we hold should and would have led any reasonably prudent person under the same or similar circumstances to protect his rights by filing his claim. Johnson v. Employers Liability Assur. Corp., 131 Texas 357, 112 S.W. 2d 449; Sandage v. Traders & General Ins. Co., Texas Civ. App., 140 S.W. 2d 871, writ refused; Copinjon v. Aetna Casualty & Surety Co., Texas. Civ. App., 242 S.W. 2d 219, writ refused.

■ To support his position that there is testimony showing the nature of his injury or condition to be such that a reasonably

prudent person might have delayed the filing of claim, plaintiff particularly emphasizes testimony of Lois Portley that "It would look like it was healing up, and again it wouldn't," interpreting this as testimony "that the condition of Portley's foot fluctuated, sometimes better and sometimes appearing otherwise." We do not think the testimony of this witness is reasonably susceptible to that interpretation when read in its entirety. But even if it is, it is directly contrary to the testimony of the plaintiff, and his conduct must be measured by the facts that came to his knowledge.

The judgments of the Court of Civil Appeals and trial court are reversed and judgment is here rendered that plaintiff take nothing and pay all costs.

Opinion delivered December 16, 1953.

Rehearing January 20, 1953.