**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Petitioner,**

v.

**Troy Alvie LEATHERS, Respondent.**

No. A–10343.

Supreme Court of Texas.

July 21, 1965.

Rehearing Denied Dec. 1, 1965.

Jones, Boyd, Westbrook & Lovelace, L. Wayne Scott, Waco, with above firm, for petitioner.

Dunnam, Dunnam & Dunnam, James F. Greer, Waco, for respondent.

HAMILTON, Justice.

This is a workmen's compensation case. The respondent alleged that he was injured by an electric switch blowing up in his face on November 11, 1954, and that said injury resulted in the burning of his face and eyes and caused an electrical shock thereto which caused him to have severe dizzy spells which started about six months after said accident, and which injury resulted in respondent's being totally and permanently incapacitated thereafter. Respondent filed his claim for compensation for said injury and total permanent incapacity resulting therefrom with the Industrial Accident Board on July 25, 1962. As ground for good cause for not filing said claim within the time required by law respondent alleged:

"* * * at the time of said injuries and up until the time he began having

said dizzy and blackout spells, he believed and was informed by physicians that he had no injury of any serious or disabling nature, and upon the outset of said dizzy and blackout spells up until a few days before the filing of his claim herein, he believed and was informed by physicians that said dizzy and blackout spells were caused by a heart condition which was congenital and had no connection with said injuries, and upon his finding out otherwise a few days prior to the filing of his claim herein, he immediately contacted attorneys and they immediately prepared his claim and filed same on the date heretofore set out, * * *."

Petitioner filed an answer under oath denying that respondent is suffering any disability or incapacity as a result of the November 11, 1954 accident, and denying that respondent had good cause for failure to file his claim within the time required by law. Petitioner thereafter filed a motion for summary judgment stating that from the pleadings and depositions on file that respondent without good cause failed to file his claim for compensation with the Industrial Accident Board of the State of Texas within the time required by law, and further that respondent has suffered no disability or incapacity as a result of the accident allegedly occurring on November 11, 1954.

In addition to the pleadings there are in the record two depositions, one taken of the respondent, Troy Alvie Leathers, and another of Dr. Chas. Dulaney. On this record the trial court granted petitioner's motion for summary judgment and entered judgment that plaintiff take nothing. The Court of Civil Appeals has reversed this judgment and remanded the cause for trial. 380 S.W.2d 852. We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

The respondent testified in his deposition that he worked for the Universal Atlas Cement Company from 1950 to December 30, 1961, and on November 11, 1954, he had an accident when an electric switch blew up in his face. He suffered burns on his face and was treated by Dr. Marstaller. He spent one night in the hospital and returned to work the next day. He had no difficulty thereafter until he had a fainting spell on the job in the latter part of 1955, about a year after the accident. He was taken to the hospital and was treated by Dr. Marstaller, his own doctor. He was released from the hospital after about four or five days. The doctor told him he had a light heart condition. He did not mention to his doctor about the accident of 1954, but said that the doctor knew about his accident. Respondent said he did not have an electrocardiogram at that time. After the 1955 hospitalization he began having dizzy spells and blackout spells once or twice a month, which continued up until December 30, 1961, when he was again hospitalized. He "took sick" with fainting spells on December 30, 1961, and went back to the hospital. He stayed there eleven days and was treated by Dr. Dulaney and Dr. Morrison. While he was there they gave him an electrocardiogram. He reported back to his company to go to work in July of 1962, the company doctor turned him down, and he was laid off.

Respondent Leathers further testified that he knew these dizzy spells were disabling, but he continued to work because he had to, as he had no other source of income; that the first time he ever got the idea that there might have been some connection between his dizzy spells and the 1954 accident was when his brother, who is an iron worker, mentioned to him that it could have been caused by the accident; that he went to a lawyer and had his claim filed two or three days after his brother told him.

Doctor Dulaney in his deposition testified that he was a member of the clinic of which Dr. Marstaller was a member in 1954 when Leathers was seen on November

11, 1954, in the emergency room at Hillcrest Hospital with first and second degree burns of the face. Leathers was admitted to the hospital with an episode of acute pneumonia and pneumonitis on October 20, 1955, and discharged on October 24, 1955. The records show that on July 6, 1959, he was complaining of chest pain and the trouble was diagnosed as pleurisy and bronchitis. An electrocardiogram was given Leathers at that time, which showed a normal heart condition.

Dr. Dulaney further testified that in January, 1962, Leathers was again hospitalized. He was complaining of blackout spells at that time. The record shows that Leathers was found to have an abnormal heart beat at the time he was seen in January and was placed on medication to slow the heart rate. He was treated again in March of 1962 as a follow-up of the blackout spells and the heart abnormality which he had developed. Dr. Dulaney concluded that the abnormal heart was a rhythm disturbance. He described it as an atrial flutter with supra ventricular tachy cardia, which he had in January and at subsequent follow-up visits. He said in effect that the cause of this type of heart condition is not known. The last time he saw him was May 23, 1962, when he discharged him. He told him that he wanted to recheck him in two weeks, but he had not seen him since.

For cause for not filing his claim any sooner than he did respondent is relying on his pleading that he did not believe his injuries were serious up until the onset of the dizzy and blackout spells which began in 1955, and that after the onset of his dizzy and blackout spells "he believed and was informed by physicians that said dizzy and blackout spells were caused by a heart condition which was congenital and had no connection with said injuries." And upon finding out otherwise from his brother he immediately filed the claim upon which this suit is based on July 25, 1962.

This record shows that for nearly seven years after Leathers began suffering from dizzy spells he consulted with doctors numerous times, but not once did he inquire as to the cause of his dizzy spells. He alleges that he believed that his heart condition was the cause of his dizzy spells and he believed his heart condition had no connection with his injury, but he says he never did ask a doctor about such connection. Consequently, his belief cannot be based on what any doctor told him. If his brother, a layman, could tell him what was causing his dizzy spells some seven years later, then a doctor should have been able to tell him much sooner had he used any diligence.

■ While good faith belief of a claimant that his injuries were caused by something other than an accident he received in the course of his employment may be good cause for failure to present his claim within the statutory time, yet such belief must meet the test of ordinary prudence. The rule as applied to a similar situation is stated by Justice Norvell in Copinjon v. Aetna Casualty and Surety Company, 242 S.W.2d 219, (Tex.Civ.App.1959, writ ref.) as follows:

"It has been held that a good faith belief on the part of a claimant that his injuries were not serious may constitute 'good cause' for failing to present a claim within the statutory time. Such belief, however, must meet the primary test of ordinance prudence. Hawkins v. Safety Casualty Co., 146 Tex. 381, 207 S.W.2d 370.

"Taking as true his statements of pain and suffering undergone by him following the accident of August 5, 1946, appellant's action in delaying the filing of his claim until December 27, 1948, does not meet the standard of ordinary prudence. This conclusively appears as a matter of law." 242 S.W. 2d at p. 220.

See also Texas Employers' Insurance Association v. Portley, 153 Tex. 62, 67, 263 S.W.2d 247 (1953).

■ Assuming as true that the disability of which Leathers complains is the result of dizzy spells caused by the 1954 accident, he had ample opportunity to learn the facts simply by asking, during some of the numerous times he consulted with doctors over a period of nearly seven years after his disability from dizzy spells began. This record shows conclusively that Leathers' conduct does not meet the standard of ordinary prudence.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

GREENHILL, J., concurs in the result.

CALVERT, C. J., and WALKER, J., dissenting.

SMITH, Justice (dissenting, joined by STEAKLEY, Justice).

I respectfully dissent. The deposition testimony, introduced in evidence, does not establish as a matter of law that the dizzy spells suffered by Leathers were not caused by the injury alleged to have been sustained by him on November 11, 1954. The record shows that there is an issue of fact as to the extent of his disability suffered as a result of his injury. There is also a fact issue presented by this record on the question of "good cause" on the part of Leathers for his delay in filing a claim for compensation with the Industrial Accident Board. These reasons furnish a sufficient basis for the affirmance of the judgment of the Court of Civil Appeals. There is still another reason why Leathers is entitled to a trial of the issues of fact raised by the pleadings and depositions. The movant has completely failed to discharge its burden of establishing that no genuine issue of any material fact existed.

Leathers pleaded that he sustained an injury on November 11, 1954, while in the course of his employment with Universal; that he filed a claim for compensation with the Industrial Accident Board of the State of Texas on July 25, 1962. It is undisputed that the Board thereafter denied the claim and Leathers duly perfected his appeal to the court of proper and competent jurisdiction, within the time prescribed by statute, to set aside the final ruling and decision of the Board. In the District Court Leathers filed pleadings alleging good cause for failure to file his claim with the Board within the time required by the Texas Workmen's Compensation Act. Leathers alleged that he sustained an accidental injury when a "square 'D' electrical switch blew up in his face," causing "a burning of plaintiff's face and eyes and causing an electrical shock thereto." The petition alleged that as a result of such injuries, Leathers, about six months after the accident, began to suffer from "severe dizzy spells" (sometimes referred to in the pleadings and depositions as "dizzy and blackout spells"). These general pleadings were followed by the following special pleadings bearing upon the issue of good cause for Leathers' failure to file his claim with the Board within six months from the date of injury:

"Plaintiff shows that, at the time of said injuries and up until the time he began having said dizzy and blackout spells, he believed and was informed by physicians that he had no injury of any serious or disabling nature, and upon the outset of said dizzy and blackout spells up until a few days before the filing of his claim herein, he believed and was informed by physicians that said dizzy and blackout spells were caused by a heart condition which was congenital and had no connection with said injuries, and upon his finding out otherwise a few days prior to the filing of his claim herein, he immediately contacted attorneys and they immediately prepared

his claim and filed same on the date heretofore set out, and all of the above facts constituted and are good cause for not filing said claim until the date that same was so filed."

Texas Employers' sworn answer to Leathers' pleadings consisted of a general denial; a denial that Leathers suffered incapacity due to an accident in the course of his employment with Universal on November 11, 1954; that, if suffering any disability or incapacity, such was due to causes or conditions unconnected with his employment; that, in the alternative, "such incapacity, if any, is partial and temporary." On the issue of good cause, Texas Employers pleaded:

"Defendant specifically denies that plaintiff filed claim for compensation within six months from the date of his alleged injury and specifically denies that he had good cause for failing to file a claim within six months as required by the Workmen's Compensation Laws of the State of Texas."

On October 3, 1963, Texas Employers filed its unsworn motion for summary judgment. No affidavits other than the attorney's affidavit attached to Texas Employers' answer were filed. No affidavits were filed by Leathers in opposition to the motion for summary judgment.

The motion for summary judgment alleged that Texas Employers was entitled to a summary judgment because it was shown by the pleadings and the depositions on file "that as a matter of law the plaintiff without good cause failed to file his claim for compensation with the Industrial Accident Board of the State of Texas within six months of the date of his alleged injury, and further it appears as a matter of law that 401 weeks have elapsed between the date of the alleged injury to the date of the filing of plaintiff's claim with the Industrial Accident Board and it further appears as a matter of law that plain-

tiff has suffered no disability or incapacity as a result of the accident allegedly occurring on November 11, 1954."

It is obvious that the motion for summary judgment as well as the answer and affidavit attached thereto are merely conclusions of law. Mere conclusions of law or fact must be ignored in deciding whether there is any genuine issue of fact. See United States v. Britten, 161 F.2d 921, (3d Cir. 1947); State of Washington v. Maricopa County, 143 F.2d 871, (9th Cir. 1944); Box v. Bates, 162 Tex. 184, 346 S.W.2d 317, (1961); Bates v. Smith, 155 Tex. 443, 289 S.W.2d 215 (1956). The underlying purpose of Rule 166-A, Texas Rules of Civil Procedure, was to eliminate patently unmeritorious claims or untenable defenses. However, in adopting the rule, the Legislature did not intend to deprive litigants of their right to a full hearing on the merits of any real issue of fact. Kaufman v. Blackman, 239 S.W.2d 422, (Tex.Civ.App.1951, wr. ref., n. r. e.); quoted with approval in Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952). Mere conclusions of law and hearsay statements made by counsel are insufficient to warrant the granting of a motion for summary judgment. See Sparkman v. McWhirter, 263 S.W.2d 832, 838, (Tex.Civ. App. 1953, wr. ref.).

The depositions considered by the Court fail to support Texas Employers' motion for summary judgment. Texas Employers, in support of its motion for summary judgment, introduced in evidence the oral depositions of Leathers and Dr. Charles Dulaney. These depositions fail, in content, to aid Texas Employers in its effort to pierce the formal allegations of fact contained in Leathers' pleadings. As stated in Sparkman v. McWhirter, supra, the object of Rule 166-A is to permit a movant for summary judgment to "pierce formal allegations of fact in pleadings and grant relief by way of summary judgment when it appears from uncontroverted facts set forth

file that, as a matter of law, there are no in affidavits, depositions, or admissions on substantive issues of fact presented for trial." In view of the failure of the movant in this case to show that its motion for summary judgment meets the requirements of Rule 166–A with respect to pleadings, affidavits, depositions and admissions necessary to demonstrate that no genuine issue as to any material fact existed, Texas Employers was not entitled to a summary judgment as a matter of law. Leathers made no admission and gave no evidence in his depositions which in any manner can be held to have defeated his cause of action under the Workmen's Compensation Act. In the case of Box v. Bates, supra, the Court pointed out that no depositions or admissions were on file in the cause. Although the depositions of Leathers and Dr. Dulaney were before the trial court, the rule announced in Box v. Bates, supra, must be applied in the present case. In order for the pleadings, depositions, admissions, if any, and affidavits, if any, to afford a proper basis for judicial action under the rule in favor of the movant, it must clearly appear therefrom that there are no substantive issues of fact presented for trial. Schreffler v. Bowles, 153 F.2d 1, (10th Cir. 1946); Sparkman v. McWhirter, supra. If, under the facts developed, the trial court would be required to direct a verdict for the moving party, then and only then a summary judgment should be entered. Christianson v. Gaines, 85 U.S.App.D.C. 15, 174 F.2d 534, (1949); Arlington Heights Appliance Co. v. Gordon, 244 S.W.2d 337, (Tex.Civ.App.1951, no wr. hist.).[1]

It is only where the motion for summary judgment is supported by affidavits, depositions, admissions, or other extrinsic evidence, sufficient upon its face to establish facts which if proven at the trial would entitle the movant to an instructed verdict,

that the opposite party is required to either come forward with evidence which will raise an issue of fact or a justification in law for his failure to do so. See McDonald's[2] article in 30 Tex.L.Rev., p. 297.

Applying these well recognized rules to the record made on the motion for summary judgment we should hold that Leathers was not under a burden to contravene the allegations in Texas Employers' motion. However, if he had such burden, then the depositions fail to establish as a matter of law that no genuine issue of fact existed. Dr. Dulaney's testimony is based largely upon the clinical records which were in his possession. According to these records, Leathers appeared at the clinic on several different occasions; the records showed that Leathers was seen by Dr. Marstaller, a member of the clinic, in September, 1953; that according to the records, Leathers appeared at the clinic on April 15, 1954, and was treated for injuries he had sustained in an automobile accident; that on April 19, 1954, he "had an acute respiratory infection"; that on July 27, 1954, Leathers "had a left inguinal hernia, and he had surgical repair of the hernia in August, the 5th, of 1954. That was in the hospital."

Dr. Dulaney testified by deposition that, according to the records, Leathers was seen on November 11, 1954 (the date of Leathers' alleged injury); that "he was seen at the emergency room at Hillcrest Hospital with first and second degree burns of the face. He stated at this time that an electrical switch blew up in his face and he had the burns, which required dressing and cleaning up"; that Leathers was not admitted to the hospital. "He was treated as an out-patient." When asked to describe the nature of the burns, the Doctor, still referring to the records, testified that "[a]pparently it was first and second de-

---

1. This Court "refused" a writ of error in 1953 in the case of Sparkman v. McWhirter, supra. That case cited with approval Schreffler v. Bowles, supra; Christianson v. Gaines, supra, and Arlington Heights Appliance Co. v. Gordon, supra.

2. Hon. Roy McDonald, author of McDonald, Texas Civil Practice 3 (1950).

gree of the face only. The record is made face and neck, but no other description is here at the time of the burns." "Q. No other complaints made there, Doctor? A. No, that's the only thing." All of this evidence relative to the November 11, 1954, visit by Leathers to the hospital to some extent at least corroborates Leathers' pleadings. The records contain evidence of examinations and treatments after November 11, 1954. In October, 1955, Leathers remained in the hospital five days. "He had acute pneumonia, pneumonitis." " * * * [h]e was actually in the hospital five days with that episode of pneumonitis and pneumonia." On December 10, 1955, Leathers, according to the records, was treated "for an acute sacroiliac sprain." This had no connection with his employment. The record reflects that on July 6, 1959, Leathers appeared at the clinic. "At that time, he had chest pains with a diagnosis of pleurisy and bronchitis." According to the records of the clinic, when Leathers next appeared "he had an acute upset stomach." Following the clinical records still further Dr. Dulaney found a notation that Leathers appeared again on October 17, 1960, "at which time he sustained a dislocated right elbow and was referred to Dr. Robert Gassler." "[T]hat was the last visit until January the 19th, 1962. At this time, the patient was seen by Dr. Woolley, who was in practice here at the time." Leathers made several visits to Dr. Woolley. "The patient was complaining of blackout spells" on January 19, 1962. "Q. Had he ever, prior to that date, complained of blackouts according to your records? A. There's no mention made prior to that at all." The testimony is confined to the clinical records. There is no evidence in this record that Leathers did not complain of "blackout spells" prior to January 19, 1962. There is no evidence in the record that Leathers did not have "severe dizzy spells, which started about six months after said accident." There is no evidence in this record that Leathers was not informed by "physicians that said dizzy and blackout spells were

caused by a heart condition which was congenital and had no connection with said injuries." As a matter of fact, Dr. Dulaney testified that the records in his clinic showed that in January, 1962, Leathers had developed an abnormal heartbeat. In this connection, the following questions and the answers of Dr. Dulaney appear in the record:

"Q. Had that [abnormal heartbeat] ever been detected before, or had he ever complained of anything before?

"A. Not to my knowledge, it hadn't been found. Like I said, he'd been seen by other people for these blackout spells; now, whether they—

"Q. That's outside of this clinic?

"A. * * * yes; when I refer to someone else, I exclude the ones that have worked in this clinic. So I don't know; I can't honestly answer that."

Dr. Dulaney testified, based upon the records, that he could see no connection between "the accident which occurred on November 11, 1954, * * * the burns on his face and his complaints at that time and subsequent thereto, * * * and the heart condition which * * * [he] observed in 1962 or at any time." Texas Employers introduced no evidence to even indicate a probable causal connection between any of the "episodes" and the accidental injury which occurred on November 11, 1954. There is no evidence in support of Texas Employers' motion that the alleged injuries sustained by Leathers on November 11, 1954, were not the producing cause of the "dizzy spells" or "blackouts" and the resultant incapacity alleged by Leathers. What I have said thus far disposes of all of the contentions of Texas Employers, except the contention that as a matter of law Leathers cannot recover be-

cause more than 401 weeks' time had elapsed between November 11, 1954, the date of the alleged injury, and the date of the filing of his claim. I would overrule this contention. Texas Employers cites no authority to sustain this contention and I have found none. To sustain Texas Employers' contention would be to deprive Leathers of the statutory right to plead and prove good cause facts excusing his failure to file his claim with the Industrial Accident Board within six months after the date of the alleged accident. Leathers should not be deprived of his day in court merely because seven years' time elapsed before the claim was filed.

Since it is clear that Texas Employers made no showing before the trial court in the nature of pleadings, affidavits, depositions, admissions or other evidence that no issue or issues of fact were presented by the record, and since it is clear that genuine issues of fact exist, the Court of Civil Appeals acted properly in entering its judgment reversing the trial court's action in sustaining the motion for summary judgment.

The judgment of the Court of Civil Appeals should be affirmed.

STEAKLEY, J., joins in this dissent.

CALVERT, Chief Justice.

I dissent.

In my opinion the deposition testimony in the record does not establish as a matter of law that Leathers' dizzy spells and fainting spells were not caused by his 1954 injury. Neither does it establish as a matter of law that he has not suffered disability as a result of his injury. The only question remaining is whether the deposition testimony establishes as a matter of law that Leathers did not have good cause for his delay in filing his claim for compensation. The Court holds that it does. I disagree.

The Court's holding that lack of good cause is established as a matter of law is grounded on a finding that Leathers' conduct during the long interval between the date his dizzy spells began in 1955 and the date on which his claim was filed in 1962 did not meet the standard of conduct of a reasonably prudent man. This finding is predicated on the failure of Leathers during the period to ask a doctor if his dizzy spells were caused by his injury. I can find no testimony in the depositions that he did not ask. But conceding that the only reasonable inference from the testimony is that he did not do so, I am yet unable to agree that he was imprudent as a matter of law in failing to take steps to rid himself of his mistaken belief that his dizzy spells were caused by a heart condition.

Leathers testified that when he had the fainting spell in 1955 his doctor told him he had a light heart condition. That testimony must be accepted as true. Should we hold that the workman, continuing to have the same symptoms and ailments for six and a half years, was imprudent as a matter of law because he failed during that period to seek a second diagnosis? Some men, more cautious than others in protecting their health, surely would have sought a second diagnosis. Others, less cautious, would have accepted their family doctor's diagnosis as the final word. Are we to say as a matter of law that none of those in the latter group are people of ordinary prudence? I would not. I would let a jury decide the issue. Accordingly, I would affirm the judgment of the Court of Civil Appeals.